IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VINCENT RODNEY HATCHER,

    Petitioner,                      No. CIV S-04-2596 MCE GGH P

    vs.

TOM L. CAREY, et al.,                ORDER AND

    Respondent.                FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus. In 1985 petitioner was convicted of kidnapping for the purpose of committing robbery (Cal. Penal Code § 209), five counts of forcible rape (Cal. Penal Code § 261(2)), during which petitioner acted in concert by means of force or violence (Cal. Penal Code § 264.1), two counts of oral copulation while acting in concert (Cal. Penal Code § 288a(d)), and oral copulation by means of force, violence, duress, menace and threat of immediate bodily injury (Cal. Penal Code § 288a(c). Answer, Exhibit E, pp. 2-3. According to respondent and the transcript from the at-issue parole suitability hearing, petitioner was sentenced to life plus five years.[1]

---

[1] Attached as an exhibit to the petition is a copy of a minute order dated May 30, 1985. According to this minute order, petitioner was resentenced to a term of 35 year, 4 months to life. If this were true, petitioner would have to serve his determine term of 35 years 4 months before the life term began to run. Cal. Penal Code § 669 ("Whenever a person is committed to prison

1

In the instant action, petitioner challenges the June 12, 2003, decision by the Board of Prison Terms (BPT) finding him unsuitable for parole. Petitioner contends that the 2003 decision was not supported by sufficient evidence. This was petitioner's fifth suitability hearing. For the following reasons, the court recommends that the petition be denied.

II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Anti-Terrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

---

on a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment shall be served first and no part thereof shall be credited toward the person's eligibility for parole as calculated pursuant to Section 3046 or pursuant to any other section of law that establishes a minimum period of confinement under the life sentence before eligibility for parole.") Because petitioner received parole hearings well before he served the determine 35 year 4 month term reflected in the minute order, the court accepts respondent's representation that petitioner is serving a term of life plus 5 years. In that case, petitioner would have to first serve his 5 year determinate term and then at least 7 years before being entitled to release on parole. Cal. Penal § 669; Cal. Penal 3046(a)(no prisoner imprisoned under a life sentence may be paroled until he has served a term of at least seven calendar years).

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state

court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

III. Discussion

*Legal Standard*

In Sass v. Cal. Board of Prison Terms, ___ F. Supp. 2d ___, 2005 WL 1406100 (E.D.Cal. 2005), The Honorable Morrison England found that the California parole scheme for indeterminate sentences does not create a federal liberty interest. Pursuant to Sass, petitioner's claim that the BPT did not have sufficient evidence on which to base the finding of unsuitability must fail because petitioner does not have a protectable liberty interest encompassing "some reliable evidence."[2]

For the following reasons, this court respectfully requests that the holding in Sass be reconsidered and that petitioner's application be granted.

Although due process does not require the existence of a parole scheme, California has established one. Not all of the myriad procedures of the parole setting system are pertinent here. The court sets forth that part of the statutory section that is pertinent:

> (a) In the case of any prisoner sentenced pursuant to any provision of law, other than Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, the Board of Prison Terms shall meet with each inmate during the third year of incarceration for the purposes of reviewing the inmate's file, making recommendations, and documenting activities and conduct pertinent to granting or withholding postconviction credit. One year prior to the inmate's minimum eligible parole release date a panel consisting of at least two commissioners of the Board of Prison Terms shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. The panel shall consist solely of commissioners or deputy commissioners from the Board of Prison Terms.
>
> The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may

---

[2] Respondent filed an Application to File a Supplemental Answer on August 8, 2005, in order to raise the Sass case. Although the undersigned does not believe that the answer need be amended to cite a case not previously available, the undersigned will order the answer supplemented.

4

issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime.

Cal. Penal Code § 3041.

In compliance with the statutory mandate, the Board of Prison Terms issued regulations which guide it in finding prisoners convicted of life offenses with parole eligibility for parole setting. Cal. Code Regs. tit. 15, § 2402 sets forth the criteria for determining whether an inmate is suitable for parole. Section 2402(a) provides that regardless of the length of time served, a prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

Section 2402(c) sets forth the circumstances tending to show unsuitability. The court lists those of significance here:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style manner.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

*****

*****

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Section 2402(d) sets forth the circumstances tending to indicate suitability:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to the victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for the Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome . . .

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

According to the Ninth Circuit, California's parole scheme gives rise to a cognizable liberty interest in release on parole. Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003). Only one aspect of that liberty interest is of pertinence here: "In the parole context, the requirements of due process are met if 'some evidence' supports the decision." Id. The evidence underlying the board's decision must have some indicia of reliability. Id.

\\\\\

6

In Biggs, the Ninth Circuit indicated that a continued reliance on an unchanging factor such as the circumstances of the offense could result in a due process violation. Biggs was serving a sentence of twenty-five years to life following a 1985 first degree murder conviction. In the case before the Ninth Circuit, Biggs challenged the 1999 decision by the BPT finding him unsuitable for parole despite his record as a model prisoner. 334 F.3d at 913. While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs unsuitable, it upheld three: 1) petitioner's commitment offense involved the murder of a witness; 2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; 3) petitioner could benefit from therapy. 334 F.3d at 913.

The Ninth Circuit cautioned the BPT regarding its continued reliance on the gravity of the offense and petitioner's conduct prior to the offense:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest.

334 F.3d at 916.

The Ninth Circuit stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." 334 F.3d at 917.

Biggs is in conformance with the stated goals of California's parole establishment system—that is, the goal is not to release persons who will be a danger to the community if released. Clearly, when looking at the commitment offense in terms of this goal, one would attempt to use it for its predictive value. The more violent, thoughtless, and callous the crime, the more likely it could be said that the perpetrator would exhibit those tendencies again. One

7

who not only killed but excessively violated society's norms is a person less likely to care about those norms when released. But, the purpose of prison, aside from punishment, is to determine for parole eligibility purposes when, if ever, these presumptions have been confirmed or rebutted.

The California Supreme Court, having once seemingly agreed with the Ninth Circuit, see In re Rosenkrantz, 29 Cal. 4th 616, 683 (2002), stating that in order for the BPT to put weight on the exceptional nature of the crime (murder), the murder had to be "particularly egregious," has now defined that term as simply "that the violence or viciousness of the inmate's crime must be more than *minimally necessary to convict him* of the offense for which he is confined." In re Dannenberg, 34 Cal. 4th 1061, 1095, 23 Cal. Rptr. 3d 417, 440 (2005). Of course, as the dissent in Dannenberg pointed out, this standard is completely unreviewable. 34 Cal. 4th at 1102, 23 Cal. Rptr. 3d at 446. The minimal elements of the crime are simply that a person dies at the hands of another with the perpetrator exhibiting the requisite intent. *Any* fact in addition to this could be one viewed as "more than minimally necessary to convict." For example, one BPT panel may believe that use of a knife per se causes undue suffering; another may believe use of any weapon where death is not instantaneous, probably the vast majority of murders, exhibits callousness. A conclusion can easily be reached by those who want to claim that the facts of *any* murder are such that they prove more than those facts minimally necessary for a conviction.

There can be no doubt that Dannenberg gives carte blanche to the BPT to issue a mere characterization of the crime to support a denial of parole. For the due process issue, the question is whether AEDPA insulates this authority from review in habeas corpus. Clearly, federal due process is not defined by all the intricacies of state law regardless of whether the state law gives rise to the protectable liberty interest.

> Although state laws may in certain circumstances create a constitutionally protected entitlement to substantive liberty interests, see, e.g., Sandin v. Conner, 515 U.S. 472, 483-84, 115

8

> S.Ct. 2293, 132 L.Ed.2d 418 (1995); Tracy v. Salamack, 572 F.2d 393, 396 & n. 9 (2d Cir.1978) (per curiam), state statutes do not create federally protected due process entitlements to specific state-mandated procedures. "Elevating a state-mandated procedure to the status of a constitutionally protected liberty or property interest, would make process an end in itself rather than a requirement whose constitutional purpose is to protect a substantive interest in which the individual has a claim of entitlement." Sealed v. Sealed, 332 F.3d 51, 57 n. 5 (2d Cir.2003) (quoting Olim, 461 U.S. at 250-51, 103 S.Ct. 1741, and Doe v. Milwaukee County, 903 F.2d 499, 503 (7th Cir.1990).

Holcomb v. Lykens, 337 F.3d 217, 224 (2nd Cir. 2003).

All that federal law requires for parole hearing due process is that the inmate up for parole consideration be given a hearing with minimal rights and that the decision be supported by "some evidence." Biggs, supra. Because the federal due process in parole suitability hearings arises from a liberty interest created by state law,[3] state courts are generally free to define their law in connection with the liberty interests as the final arbiters of their state law. Thus, in general, if state courts desire to define their state's parole criteria in a restrictive fashion, the liberty interest is characterized by those restrictive holdings.

However, state courts may not interpret their law in such an arbitrary manner that the interpretation is nothing but an evasion of the federal due process requirements, minimal as they may be. "[W]e are bound by the state's construction [of state laws] except when it appears that its interpretation is an obvious subterfuge to evade the consideration of a federal issue." Peltier v. Wright, 15 F.3d 860, 862 (9th Cir.1994); see also Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.1989) ("Our deference to the [state] Court is suspended only upon a finding that the court's interpretation [of state law] is untenable or amounts to a subterfuge to avoid federal review of a constitutional violation."). The question ultimately to be decided here is whether the Dannenberg interpretation is so unreviewable, i.e., the facts underlying *any* murder can stand as "some evidence" to deny parole suitability, that the federal standard of "some

---

[3] Federal due process does not require that a state have a parole system. Greenholtz v. Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1, 7, 99 S. Ct. 2100, 2104 (1979).

9

evidence" is, in essence, completely eviscerated.

The undersigned is mindful that a majority of justices on the California Supreme Court in Dannenberg (4-3 decision) implicitly answered the question in the affirmative, although federal due process and liberty interests were not at issue per se in that case. Therefore, it would, and should, be rare indeed that a lower court federal judge should find the decision of a state supreme court to be an unreasonable application of clearly established Supreme Court authority. The question goes so much further than whether the undersigned believes that the dissent had the better of the argument. Even clear error is insufficient. That having been said, the undersigned cannot find a justifiable reason to find that the determination was reasonable.

As it stands now, the law in California permits parole to be denied *solely* on the basis of the nature of the crime. "The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." In re Rosenkrantz, 29 Cal. 4th 616, 682, 128 Cal. Rptr.2d 1104 (2002). However, the historical facts of the crime will never change, and all prisoners having been found to have committed a crime with facts "more than minimally necessary to convict," i.e., nearly everyone, can have their life with parole case effectively transmuted to life without parole – because the facts of the offense will never change. Under present California law, the BPT does not set the sentence, and therefore due process does not permit the BPT to change the court imposed sentence either *de jure* or *de facto*.

But, one might argue, a later panel may ultimately assess the unchangeable facts of the case differently than a previous panel, or two, or three, etc. This argument, however, gives no substance to due process notions. The argument would expressly hinge due process on the luck of the draw, that is, maybe (but doubtful) a panel will come along that will view the facts as not more than minimally necessary to convict. Compelling due process to hinge on such an arbitrary factor is no due process at all.

One final argument could be made to support the Dannenberg standard. The BPT is not *compelled* to deny parole solely on the basis of the "aggravated" nature of the crime. But

this argument does not cure the due process defect either. Simply because some inmates may, at essentially the sole discretion of the BPT, receive a parole eligibility finding despite the existence of an unreviewable and standardless "nature of the crime" factor (and not many inmates have) – does not mean that the factor is therefore constitutional when used to deny parole. The deficiency in the factor is in its standardless, meaningless application per se when used to deny parole suitability. Due process in a particular case is adjudged on an individual, not statistical, basis. In other words, a due process violation against one person is not answered by reference to another person who suffered no ultimate harm as a result of the violation.

Thus, the undersigned must continue to follow Biggs. Repeated application of the severity of the crime factor will violate due process when the crime for which incarceration was required grows more remote. Although the Ninth Circuit in Biggs did not explicitly state when reliance on an unchanging factor would violate due process, it makes sense that reliance on such a factor becomes unconstitutional when the factor no longer has predictive value.

In Sass, Judge England found that no federal liberty interest was created because the wording of the parole statute, Cal. Penal Code 3041(a) ("a panel *shall normally* set a release date..) and §3041(b) ("the panel...*shall set* a release date....") was insufficiently mandatory. Judge England relied heavily on In re Dannenberg, 34 Cal. 4th 1061, 1098, 23 Cal. Rptr. 3d 417, 443 (2005) which admittedly, and as previously set forth, vested almost unlimited, unreviewable discretion within the BPT when it came to determining parole eligibility. However, even assuming that the "old" Supreme Court paradigm regarding creation of a liberty interest (mandatory act and underlying factual predicates) remains the analytical framework in which to judge the creation of right-to-parole liberty interests, see e.g., Board of Pardons v. Allen, 482 U.S. 369, 378, 107 S.Ct. 2415, 2421(1987) (mandatory language in a parole statute creates a "presumption of release" and gives rise to a liberty interest), California law, both before and after Dannenberg finds that the California parole scheme for indeterminate offenses does create a liberty interest.

> In sum, the governing statute provides that the Board *must grant parole* unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction. (Pen.Code, § 3041, subd. (b).) And as set forth in the governing regulations, the Board *must set a parole date* for a prisoner unless it finds, in the exercise of its judgment after considering the circumstances enumerated in section 2402 of the regulations, that the prisoner is unsuitable for parole. (Cal.Code Regs., tit. 15, § 2401.) Accordingly, parole applicants in this state *have an expectation that they will be granted parole* unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation.

In re Rosenkrantz, 29 Cal.4th 616, 654, 128 Cal.Rptr.2d 104, 138 (2003) (emphasis added).

It is difficult to conceive of words which mirror the requirements of the Allen mandatory-act-in light-of-satisfied-factual-predicates paradigm more than the emphasized words of Rosenkrantz. Indeed, Allen and Rosenkrantz use the same terminology, i.e. "presumption" of release and "expectation" of release. These are the words of liberty interest creation. It is not material that great discretion is vested within the administrative agency granting parole. Allen supra. See also the post-Dannenberg case of In re DeLuna,126 Cal.App.4th 585, 591, 24 Cal. Rptr. 3d 643, 647 (2005):

> Penal Code section 3041, subdivision (b) requires the Board to "set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." *This statute creates a conditional liberty interest for a prospective parolee.* (Cf. Rosenkrantz, supra, 29 Cal.4th at p. 661, 128 Cal.Rptr.2d 104, 59 P.3d 174; McQuillion v. Duncan (9th Cir.2002) 306 F.3d 895, 901-902.) (emphasis added)[4]

The undersigned can only find that California law is in disarray on the subject of liberty interest created by the California parole statutes. Dannenberg did not overrule

---

[4] Dannenberg did find that California prisoners had no liberty interest in a *uniform* parole date, 34 Cal. 4th at 1098 (n.18), 23 Cal. Rptr. 3d at 443 (citing Rosenkrantz); however, this is a far cry from holding that the parole scheme as a whole does not create a conditional liberty interest.

Rosencrantz, and implied overrulings are extremely disfavored. Scheiding v. Gen. Motors, 22 Cal. 4th 471, 478, 93 Cal. Rptr. 2d 342, 346 (2000). Indeed, California cases after Dannenberg continue to find a liberty interest and cite Rosencrantz. Therefore, Biggs and McQuillion should not, and cannot, be cast aside based on the ambiguities in California law unless the Ninth Circuit so holds.

*Analysis*

In order to put the decision by the BPT in context the court will set forth the factual background of petitioner's offenses as described by the California Court of Appeal. The description of the offenses is not disputed.

> At approximately 6:00 p.m. on February 12, 1983, Miss W. had approached her automobile and was putting the key into the front door when a vehicle containing two men drove up beside her. Someone opened the door of a Lincoln Continental, at which point Miss W. thought the person intended to ask her a question. Defendant Hatcher snatched her keys, grabbed her and forced her into the vehicle. She was placed in the front seat between defendant Hatcher and defendant Earl, who was driving.
>
> As defendant Earl drove away, defendant Hatcher asked whether she had any money; when she said she did not, he searched her pockets. Defendant Earl drove on to the Santa Monica Freeway and then onto the southbound Harbor Freeway. At this point, she was told to get into the back seat, lie down and keep her eyes closed. Defendant Hatcher followed her into the back seat and lay on top of her. The automobile left the Harbor Freeway at 51 Street and ultimately stopped at a garage; Miss W. was told to keep her eyes closed and, after defendant Earl opened the garage, defendant Hatcher led her inside. The defendants left her alone for approximately five minutes, during which she sat on a couch in a state of shock.
>
> Defendant Hatcher then entered the garage and made her remove her clothing, after which he committed an act of sexual intercourse. When Miss W. asked him why he was doing this to her, why they had brought her there, defendant Hatcher replied it would not have happened had she had some money. He then walked out of the garage.
>
> Shortly thereafter, defendant Earl entered the garage; Miss W. asked him to take her home. Defendant Earl forced her to engage in oral copulation. He then engaged her in an act of sexual intercourse, after which he left and defendant Hatcher reentered the garage. Miss W. kept asking him to take her home or leave her alone. During this period, defendant Earl drove away returning shortly with one Glenn Turner (Turner) and several other young men. After both defendants talked to Turner, defendant Hatcher walked Miss W. back to defendant Earl's automobile, which defendant Earl drove to a vacant house about five blocks away; Turner accompanied them.

When they reached the house, defendant appeared to argue, after which defendant Hatcher took Miss W. into the house through a back entrance near the kitchen. He took her into the living room and engaged in an act of sexual intercourse. He then walked out and Turner entered. Following an abortive effort to engage Miss W. in acts of oral copulation and sodomy, Turner completed an act of sexual intercourse. Thereafter, he walked outside and drove away with defendant Earl.

At this point, Miss W. and defendant Hatcher went outside where defendant Hatcher told her they were waiting for defendant Earl to return. After some time had passed, defendant Hatcher walked her back to the garage; she did not want to return and though of calling out for help, but she was afraid he would hurt her. At some point she realized she was not far from her sister's home.

Once they reached the garage, defendant Hatcher again made Miss W. remove her clothing. He orally copulated her and then engaged in an act of sexual intercourse. A woman knocked at the garage door; defendant Hatcher told Miss W. to sit there and not say anything. He then went to talk to the woman.

Shortly thereafter, the woman left and defendant Hatcher reentered the garage. Some of the young men Miss W. had seen earlier in the evening returned; they remained approximately 30 minutes, drinking beer. Defendant Hatcher told them she was his girlfriend. She asked one of the young men for help, but he did not want to become involved. Miss W. asked defendant Hatcher to let her go; she said she would not say anything about what had happened, but defendant Hatcher refused, saying he could not trust that.

Defendant Hatcher then made her lie down on the couch against the back; he lay in front of her, stating he intended to take a nap and decide later what to do with her. They both fell asleep, but Miss. W. awoke some time later as defendant Hatcher continued to sleep. She climbed over him, crawled under the garage door and ran. When she realized exactly where she was, she ran to her sister's home; it was then 2:30 a.m. She telephoned her mother from her sister's, after which her mother took her home. Her mother wanted her to go directly to a hospital and telephone the police, but she wanted to go home.

When Miss W. arrived home at approximately 2:50 a.m., she took a bath and went to bed. When she awoke later that day, she telephoned the police; they came to her house and interviewed her, after which they took her to a hospital. She had given the officers full descriptions of both defendants and Turner; she mentioned defendant Hatcher had one earring and was wearing a silver digital watch. After she was examined at the hospital, she took the police officer to the garage and vacant house. When the officers drove up to the vacant house, she remained in the patrol vehicle. Los Angeles Police Officer Karen Owens and her partner entered

the house, after which they heard a noise. In response, they entered another room, where they saw defendant Hatcher. They escorted him outside, where Miss W. immediately identified him. He was wearing one earring and a digital watch; he was placed under arrest.

Respondent's Answer, Exhibit E, pp. 3-7.

1  In finding petitioner unsuitable, the BPT made the following findings:

2  The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The commitment offense was carried out in an especially cruel manner. The victim was defiled during the offense. It was carried out in a manner that demonstrates a callous disregard for human suffering. These conclusions are drawn from the Statement of Facts, wherein the prisoner and his crime partners kidnapped for robbery, Heidi Watson, an 18 year old girl. She was abducted by Hatcher while she was getting into her car. He walked up behind her, asked her for her money, and then forced her into her vehicle–the co-defendant's vehicle.

*****

Okay. She was taken to a second location, where she was raped twice by the prisoner and orally copulated. And then a third associate also committed a rape on the 18-year-old-victim. The–Mr. Hatcher stayed at the same location while two of the crime partners left. They fell asleep and she escaped and went to–I believe it was her sister's house that was nearby. The prisoner has a record of violence and assaultive behavior. Has failed to profit from society's previous attempts to correct his criminality. Such attempts include CYA commitment and adult probation, county jail, and parole. The prisoner has an unstable social history and prior criminality that includes arrests and convictions for assault with intent to commit murder, attempted robbery, and possession of PCP. Drug abuse began at the approximate age of 15, and continued until the commitment offense. The drug abuse was so severe that during the commitment offense, he claims now that he is unable to remember what happened at all. The prisoner has not sufficiently participated in beneficial self-help. He's only participated in beneficial self-help. He's only participated in self-help, according to his C-File, since 2001. The psychiatric report of March 19th, 2003, authored by Charles Taylor, PhD., is inconclusive. The psychologist does not address the prisoner's prior violent criminal history nor does he address his prior history of drug abuse. The psychiatrist or psychologist also does not support, with facts, his conclusion that the prisoner is a low risk of dangerousness. The District Attorney from Los Angeles County sent a representative who participated in the hearing, and was opposed to parole at this time. The Panel makes the following findings: The prisoner needs to continue to participate in self-help in order to face, discuss, understand and cope with stress in a non-destructive manner. Until progress is made, the prisoner continues to be unpredictable and a threat to others. The prisoner should be commended for receiving no 115's since 1996, for participating in self-help such as AA, NA for (indiscernible) and Life Skills, Parenting for (indiscernible) Parents, and substance abuse. Also Victims of–Victim Offender Reconciliation Group. We were–These were all done since 2001. He also has a vocational certificate in sewing machine repair and is currently in vocational office services. However, these positive aspects of his behavior do not outweigh the factors of unsuitability.

Respondent's Answer, Exhibit C, pp. 59-61.

In finding petitioner unsuitable, the panel relied on several unchanging factors: 1) the offense demonstrated a callous disregard for suffering (§ 2402(c)(1)(D)); 2) the victim was abused during the offense (§ 2402(c)(1)(C); 3) petitioner's previous record of violence based on petitioner's prior conviction for assault with intent to commit murder, see Answer, Exhibit C, p. 12 (§ 2402(c)(2)); 4) petitioner's unstable social history based on his history of drug abuse (petitioner began using marijuana at age 13 and PCP at age 15. Id., p. 15; prior to his arrest for the incident involving Miss W., petitioner had used cocaine heavily for five months and had been consuming excessive amounts of alcohol. Id., p. 16; wen he committed these offenses, petitioner was high on crack, cocaine, PCP and alcohol. Id., p. 9) (§ 2402(c)(3)).

No one can doubt that petitioner's actions were cruel and callous or that the victim was terribly abused. These actions would have justified a denial of parole eligibility on the first, second or even third attempt. But because of the length of time that had passed since petitioner's commitment offense (over 20 years as of the 2003 hearing) and because this was petitioner's fifth suitability hearing, the court finds that these factors standing alone had lost any predictive value, i.e. whether the unchanging factors constitute "some evidence." If the rule were otherwise, the callousness of the 1985 conduct would result in a life without parole sentence, i.e., the callousness, indeed the depravity of the conduct, will never change. Pursuant to Biggs, this court must consider whether these factors still had any predictive value based on petitioner's post-conviction conduct. Otherwise, the BPT has transformed petitioner's sentence to one of life without the possibility of parole.

Petitioner's conduct in prison was non-problematic. The BPT did not discuss petitioner's prison disciplinary history in detail. The psychologist's report prepared for the hearing stated that petitioner had had "some" 115's (rules violations) and 128's (counseling chronos), with the last one in 1996. Exhibit, Traverse. Because the BPT did not rely on petitioner's disciplinary record to find him unsuitable, the court presumes that his convictions were in the past and relatively minor.

Dr. Charles Taylor prepared a psychological report for petitioner's 2003 suitability hearing and concluded that petitioner would pose a low risk of dangerousness if released:

> The inmate suffered from personality characteristics, but no psychopathology was or is present according to the information available. He has no impulses to hurt others and does not want to "inflict any more pain on the planet." No one is after him that he knows of. He appears quite connected to family members on the outside, has an admirable disciplinary history, has upgraded himself educationally and vocationally, admits responsibility for the crime with remorse and empathy, has participated in self help groups and appears to have marketable skills, albeit without a specific job offer. He evidences no particular mood, attitude, impulse or anger dyscontrol related to dangerousness at this time. He tends to talk in some generality about the crime, but his behavior and attitude seem to include the necessary controls of behavior. He is considered to have a low risk of dangerousness upon release, provided he remains free from substance abuse.

Traverse, Exhibit.

With respect to petitioner's history of drug abuse, the BPT did not dispute that petitioner had attended NA and AA for the previous two years. Respondent's Answer, Exhibit C, pp. 22-23. Petitioner also had a certificate from the Men's Violence Prevention program and the Anger Management Program. Id., p. 24.

Petitioner's prison record demonstrated a lack of violent conduct and Dr. Taylor found that petitioner would pose a low risk of dangerousness upon release.[5] Based on these facts, the court finds that the unchanging factors regarding the circumstances of the commitment offense and petitioner's prior criminal record no longer had predictive value based on petitioner's post-conviction conduct.

With respect to petitioner's substance abuse problems, Dr. Taylor did not find that petitioner required additional participation in drug treatment prior to parole. Petitioner testified that he had regularly attended NA and AA for the two years preceding the 2003 hearing. Based on these facts, the court finds that the unchanging factor of petitioner's long ago substance abuse

---

[5] In its decision, the BPT panel discounted Dr. Taylor's report on grounds that he had failed to address petitioner's history of violent crime and drug abuse. However, Dr. Taylor's report discussed petitioner's criminal and substance abuse history. Therefore, Dr. Taylor was well aware of these factors when making his assessment.

problem no longer had predictive value based on petitioner's post-conviction conduct.

Because the unchanging factors relied on by the BPT no longer had predictive value based on petitioner's post-conviction conduct, they did not constitute "some evidence" on which to find petitioner unsuitable for parole. Therefore, the BPT's reliance on these factors violated petitioner's right to due process.

The only factor relied on by the panel in finding petitioner unsuitable not based on an unchanging factor was petitioner's failure to participate in beneficial self-help programs since his incarceration. § 2402(d)(9)(institutional activities indicate an enhanced ability to function within the law upon release). At the hearing, petitioner told the panel that the previous panel in 2001 had recommended that he attend NA. Respondent's Answer, Exhibit C, p. 22. Petitioner told the panel that he had attended all of the NA and AA classes available to him since his previous hearing. Id., p. 23. As discussed above, petitioner had also obtained certificates in Men's Violence Prevention and Anger Management since his previous hearing. Id., p. 24. Petitioner told the panel that he had participated in all the programs that were available to him. Id. In his report, Dr. Taylor did not find that petitioner required psychiatric treatment. Nor did he recommend that petitioner obtain additional therapy for drug and alcohol abuse prior to being paroled.

Based on petitioner's consistent participation in drug treatment and Dr. Taylor's report, the court finds that the BPT's finding that petitioner had failed to participate in sufficient self-help programs was not supported by some evidence.

For the reasons discussed above, this court finds that the BPT's 2003 decision that petitioner was not suitable for parole was not supported by some evidence. The court respectfully requests that the district court reconsider its decision in Sass, supra, and grant petitioner's habeas petition. However, the court will recommend that the petition be denied pursuant to Sass as this case contains the district court's view regarding the issues raised in this action.

\\\\\

Accordingly, IT IS HEREBY ORDERED that:

1. The Federal Defender is appointed to represent petitioner;

2. The Clerk of the Court shall serve a copy of this findings and recommendations and order on David Porter, Assistant Federal Defender;

3. Respondent's August 8, 2005 Application to File a Supplemental Answer is granted.

IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 8/10/05

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

ggh:kj
hatch2596.157